IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Pablo Air Charter, LLC,                                           Case No. 3:20-cv-02693-JGC

    Plaintiff,

    v.                                                                        **ORDER**

Kristine K. Black *et al.*,

    Defendants.

    This is a breach of contract and fraud case. Plaintiff Pablo Air Charter, LLC ("Pablo Air") is a commercial air travel company based in Pennsylvania. Defendant Kristine K. Black is the former sole owner of Island Seas, LLC ("Island Seas")—an air-charter business that Ms. Black sold to Plaintiff. Defendant Charles Black is a licensed pilot, listed on Island Seas' regulatory operating certificate as the authorized pilot and director of operations.

    Plaintiff claims that Ms. Black breached the contract for the sale of Island Seas. Plaintiff also claims that both Defendants committed fraud and fraud in the inducement. (Doc. 1).

    Pending is Defendants' Motion for Summary Judgment. (Doc. 49). Plaintiff has submitted a response in opposition (Doc. 55), and Defendants have submitted a reply (Doc. 56).

    For the reasons that follow, I grant Defendants' Motion in part and deny the Motion in part.

**Background**

Island Seas was an air charter business that owned aircraft and operated privately chartered flights on those aircraft. (Doc. 49, pgID 291).[1] Defendant Kristine Black was the sole member and principal of Island Seas, LLC. (Doc. 1, ¶ 8). Defendant Charles Black was Island Seas' director of operations and the only pilot authorized to fly charter aircraft for the company. (Doc. 49-1, pgID 325). Ms. Black and Mr. Black are married. (Doc. 49, pgID 291). They also share an email address. (Doc. 41, at 114:18–24).

### 1. The FAA Single Pilot Charter Certificate

Island Seas' single-pilot restriction is central to the FAA certificate under which it operated. Under the FAA 135 Single Pilot Charter Certificate ("Certificate"), only the pilot named on the Certificate can be the "Pilot in Command" of Island Seas' aircraft. (Doc. 49, pgID 291).

Island Seas needed to have and maintain its Certificate to operate its business. No Certificate means no flying, and no flying means no revenue. (*See* Doc. 1, ¶ 16).

---

[1] Plaintiff and Defendants provide factual statements in their briefs that are not supported by competent record evidence. *See* Fed. R. Civ. P. 56 (c)(1). Plaintiff cites to the unverified allegations of its Complaint; these are not proper facts I can consider as a basis for granting or denying summary judgment. *See Bormuth v. Cnty. of Jackson*, 870 F.3d 494, 519 (6th Cir. 2017).

Defendants, for their part, do not cite to the record at all for several of the factual assertions in their brief. I likewise do not consider those facts as a basis for this Order. *See Schroeder v. Copley Newspaper*, 879 F.2d 266, 271 (7th Cir. 1989) ("[F]acts stated in a brief are insufficient to create a genuine issue of material fact."); 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2723 (4th ed. ) ("It is true that summary judgment cannot be granted solely on the basis of statements of fact in the moving party's brief even though they are uncontroverted by an opponent."); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials[.]").

I include citations to Plaintiff's Complaint (Doc. 1) and Defendants' memorandum of law in support of its Motion for Summary Judgment (Doc. 49) for the limited purpose of providing part of this litigation's background, which is not in dispute.

### 2. Island Seas' Sale to Pablo Air

During summer 2020, Ms. Black was discussing the potential sale of Island Seas to Plaintiff Pablo Air. On August 1, 2020, Pablo Air sent a representative to inspect one of Island Seas' airplanes—a Cessna 414, FAA registration number N490KM ("Cessna 414"). (Doc. 49, pgID 291–92). Pablo Air's representative reviewed the Cessna 414's logbooks and conducted a physical inspection of the plane. This was the only pre-purchase inspection Plaintiff performed. (*Id.*, pgID 292).

Pablo Air and Island Seas signed a "letter of intent" ("LOI") on August 11, 2020 for the sale of Island Seas. (Doc 49-3).[2] Under that proposal, Pablo Air would obtain the business and its assets, including, *inter alia*, the FAA Certificate and the Cessna 414. (*Id.*, pgID 328). According to the LOI, the parties did not contemplate selling any of Island Seas' other aircraft to Pablo Air during the transaction.

The parties agree that the LOI is not itself an enforceable contract, and there is no evidence in the record that they subsequently entered into a written contract. Rather, Plaintiff contends, and the Defendants appear to concede, that Pablo Air and Ms. Black entered into an oral contract that adopted the LOI's terms.

Several portions of the agreement to sell Island Seas to Plaintiff, as reflected in the LOI, are pertinent:

**1. Purchase Price.** . . . The Purchase shall consist of the following:

[. . .]

**(2)** Assets:

---

[2] Ms. Black, on behalf of Island Seas, was the sole signatory on the copy of the LOI at Doc. 49-3. Robert Lowe, on behalf of TAC Air Charters LLC, "docusigned" a largely identical version of the LOI. TAC Air Charters is the company that became Pablo Air. (Doc. 49-4).

    (A)    FAA Part 135 charter certificate # 7ILA753N [*i.e.*, the "Certificate"]

    (B)    [] 1973  Cessna 414 c/n 414-0399 – N490KM  [*i.e.*, the "Cessna 414"]

           [. . .]

    (F)    Seller will provide aircraft records of current maintenance program for any aircraft being leased/purchased which details scheduled maintenance intervals and time remaining . . .

**(3)** Owner Consultation:

    (A)    Current 135 Owner/Seller, will from time to time, be requested to assist with the operation up to and including

          i.    Providing assistance with the transfer of the 135 certificate # 7ILA753N to the CMH or TBA FSDO office

          ii.    Provide assistance with the change of certificate from a Single to a Full 135 operation

          iii.    Provide assistance with on-site consulting . . .

[. . .]

**2.  Due Diligence.**

[. . .]

    c.    **Consents and Approvals. The Seller will act in good faith to complete all activities** necessary or appropriate to the acquisition of the capital stock and for the prospective business operation by Purchaser, including, but not limited to, receipt of all necessary governmental approvals to affect transfer of all Business assets to the Purchaser.

        [. . .]

    d.    **Access to key personnel.** Seller grants Purchaser access to key personnel as related to the operation of the business as is mutually-agreeable to both parties, in particular, Chief Pilot, Director of Operations and Director of Maintenance.

(Doc. 49-3, pgID 328–29).

### 3. Transitioning the Operating Certificate to Pablo Air

Once ownership of Island Seas transferred to Pablo Air, on August 26, 2020, Ms. Black emailed Island Seas' assigned FAA inspector to introduce her to Pablo Air's owners and managers. (*See* Doc. 49-6). The FAA Inspector was responsible, in part, for ensuring that the Certificate, and its charter operations, properly and safely transitioned from Ms. Black and Mr. Black to Pablo Air.

After the introduction, on September 10, 2020, the FAA inspector held a virtual Zoom meeting attended by Robert Lowe and John Valentine from Pablo Air along with Mr. Black and Ms. Black. (Doc. 49-8, pgID 342). The meeting's purpose was to discuss the process for the transition of operations to Pablo Air. (*Id.*).

Following the meeting, the FAA inspector made changes to the Certificate and proposed others to decisionmakers in the FAA. (*Id.*). Under those plans, Pablo Air would become the new "certificate holder" (*Id.*); John Valentine, as Pablo Air CEO, would take over as manager and agent (Doc. 55-3, pgID 441; Doc. 55-4); and Mr. Black would remain as pilot, with a new chief pilot to be named at a later date (Doc. 49-8, pgID 343–44). Mr. Black would also remain as director of operations until Mr. Valentine could take over in that role. Finally, the Cessna 414 would remain on the Certificate, but the other two other aircraft still owned by Ms. Black, both Cessna 310s, would likely need to be removed. (*Id.*; Doc. 55-5, pgID 447).

Soon after these initial meetings with the FAA, and as shown through a series of emails sent over three days, the parties had a falling out.

Starting on September 25, 2020, Mr. Black sent an email to the FAA inspector. He asked if Ms. Black could remove the Cessna 310s she still owned from the Certificate since Mr.

5

Valentine and Pablo Air were going to have operational control of the Certificate. (Doc. 55-5, pgID 447).

That same evening, Ms. Black emailed Pablo Air, stating that before Mr. Black could transfer operational control on the Certificate, Pablo Air needed to decide whether it wanted to keep one or both of the Cessna 310s on the Certificate—presumably by purchasing them. (*Id.*, pgID 446–47). She wrote, "[A] decision needs [to be] made because we will not give over operational control on planes that you don't own. Either get money to [the title company] or they are both coming off and operational control goes to [the new pilot]." (*Id.*).

Mr. Valentine responded about two hours later. He said that Pablo Air was under the impression the Cessna 310s were already removed, but since they were still on the certificate, he would continue having internal discussions about their possible purchase. (*Id.*, pgID 446). He agreed with Ms. Black that, if Pablo Air decided not to purchase the planes, they would need to come off the Certificate. (*Id.*).

Ms. Black tersely responded the next day on September 27, 2020: "What part of this[] don't you get?" (*Id.* pgID 445). Pablo Air replied in kind: "I have to admit you are good at double talk." (*Id.*, pgID 444). Pablo Air also included an image or file attachment in their email, presumably explaining their reply, but it is not included in the record. (*Id.*).

The situation worsened. Ms. Black responded about ten minutes later:

> Clearly you don't have the money or knowledge to run a 135 [certificate]. You talk a bunch of shit to people that have operational control of your company. The bottom line is, the [Cessna] 310's are currently on the ticket and Chuck has operational control. If you wanted to buy [the Cessna 310] then get the money to [the title company] and if not we are done. We did our part to transition over. Seriously, have dealt with people like you before. Put up or shut up. Buy the plane or don't. Good grief we have bent over backwards trying to accommodate you. Once again for the people in the back . . . BOTH 310's are still on the ticket and we have operational control. Make a move or we will.

6

(*Id.*, pgID 443). The Defendants made their move less than twenty-four hours later. Mr. and Ms. Black emailed jointly:

> Don't bother calling. We are removing the [Cessna] 310's and retain operational control until we have confirmation they have been removed. You terminated the sale on the 23rd and did not tell us. Good luck finding someone to move the [Cessna] 414. We have fulfilled our obligations to you. Please do not feel free to contact either of us anymore.
>
> Respectfully,
> Kris and Chuck

(Doc. 55-8).

About two weeks later, on October 12, 2020, Mr. Black learned that Pablo Air was in the process of selling the Cessna 414. (Doc. 49-21). Apparently, after Pablo Air took possession of the plane from the Defendants, an inspection revealed maintenance problems that made it unsafe to fly—or "unairworthy"—and economically infeasible to repair. (Doc. 44, at 30:6–17).

Mr. Black emailed the FAA inspector on October 12, 2020 about the sale and Pablo Air's Certificate. According to his email, he did so without first speaking to Pablo Air,[3] the Certificate holder, and without including Pablo Air on the email. (*Id.*, pgID 374–75). He complained that Pablo Air sold the Cessna 414 without telling him and that he was "not being informed as to what is happening, leaving [him] very liable." (*Id.*, pgID 375). He requested that the FAA remove the two Cessna 310s from the Certificate, which his spouse still owned, and remove him as the director of operations under the Certificate. (*Id.*).

The next day, on October 13, 2020, Pablo Air sent a letter to the FAA, copying Mr. and Ms. Black. (Doc. 49-11). The letter said, "[D]ue to the continued unavailability of Charles

---

[3] According to Mr. Black's deposition testimony, he did speak with Mr. Valentine about the Cessna 414 sale. (Doc. 41, at 51:23–25). However, it is unclear from the record when that conversation happened or what else they discussed.

'Chuck' Black to operate, train, or evaluate any pilots for Island Seas, or maintain their contractual obligations, Island Seas is terminating the employment of Mr. and Mrs. Black, effective immediately." (*Id.*). The letter explained that Pablo Air previously submitted to the FAA a replacement pilot for their review. If the FAA approved the replacement pilot, the letter requested that Mr. and Ms. Black be completely removed from their obligations under the Certificate. (*Id.*).

The FAA inspector responded to the parties' communications on October 14, 2020 "to ensure everyone is on one page and working with one common goal for the [Certificate]." (Doc. 49-12. pgID 361). The FAA explained its concerns:

> Our office understands that Island Seas is currently undergoing a change of management, yet that change of management cannot disrupt operations in a manner which affects public or Air Carrier safety. The personnel designated on an Air Carrier certificate must be committed to safety of operations and ensure all applicable policy, procedures and regulatory requirements are met.

(*Id.*, pgID 361–62).

The FAA explained that Mr. Black, as the current person with operational control, is the only person that can request a change in operational control and a change of pilot. (*Id.*, pgID 362). The FAA inspector then instructed the parties to resolve the management issues by October 30, 2020, or the FAA would begin discussing a temporary suspension of the Certificate. (*Id.*).

The Defendants and the FAA then exchanged several emails on October 16, 2020. Beginning at 7:14 a.m., Mr. Black wrote to the FAA, copying Pablo Air on his email. (Doc. 49-13). He again complained that Pablo Air did not tell him they were selling the Cessna 414. He stated that he no longer had access to or control of the Cessna 414 due to the sale, which concerned him because the plane was still on the Certificate. (*Id.*, pgID 363). He accused Pablo

8

Air's managers of creating a "ruse" and a "game they are playing with the FAA and [himself]." (*Id.*).

Mr. Black said that he maintained his positions on the Certificate "to help transition the process of new ownership of Island Seas," but he disclaimed ever being employed or paid by Island Seas. (*Id.*). He acknowledged that Pablo Air wanted to remove him from operational control under the Certificate, so he submitted his "resignation in whole" and asked the FAA to remove him and the planes from the Certificate. (*Id.*, pgID 363–64).

The FAA inspector responded less than 30 minutes later, at 7:42 a.m. (Doc. 49-14). She said that if Mr. Black and the planes were removed from the Certificate, the Certificate would no longer be valid and would need to be "voluntarily surrendered." She then asked Mr. Black: "Is the [Certificate] being voluntarily surrendered by you at this time?" (*Id.*) She explained that, if that were the case, the Certificate would immediately be terminated without the possibility of reinstatement; any future request for a new certificate would need to go though the standard "initial certification" process. (*Id.*).

Ms. Black entered the conversation in an email she sent at 7:55 a.m. (Doc 49-15). She dropped Pablo Air from the email and sent it only to the FAA inspector. She asked if the Certificate could be suspended only temporarily if Mr. Black stayed on as pilot but removed the planes. (*Id.*).

The FAA inspector responded at 8:00 a.m. (Doc. 49-16). Pablo Air remained off of the email. The inspector said that the FAA could possibly do a temporary suspension of the Certificate if the parties removed the planes from it; however, the parties would need to submit an "action plan" for getting a new director of operations in place. (*Id.*).

9

Ms. Black emailed three minutes later, at 8:03 a.m., with a different proposal. (Doc. 49-17). She asked if there could be a temporary suspension if the Cessna 414 stayed on the Certificate with Mr. Black taking himself off as pilot and director of operations. (*Id.*).

The FAA inspector, at 8:08 a.m., stated that the proposal would not be possible. (Doc. 49-18). She explained that, if Mr. Black removed himself from the Certificate without a new pilot in his place, it would result in "an immediate termination." (*Id.*). Pablo Air remained off of this email.

Mr. Black emailed the FAA inspector at 9:18 a.m., saying he had a question on an application and asking if she could call him. (Doc. 49-19). The inspector responded at 9:33 a.m. that she was in meetings and that Mr. Black could email the question for her to review. (*Id.*).

Later that day, at 5:28 p.m., Mr. Black sent an email to the FAA. (Doc. 49-20). He wrote: "Inspectors, I am voluntarily, effective immediately, surrendering the Air [C]arrier Certificate for Island Seas." He did not include Pablo Air, the Certificate's owner and holder, on this email.

The FAA inspector accepted Mr. Black's surrender of the Certificate, resulting in its termination. (*See* Doc. 55-7, pgID 451). Without the Certificate, Pablo Air could not operate its business. Pablo Air then filed this lawsuit against Ms. And Mr. Black on November 25, 2020. (Doc. 1).

## Legal Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. The movant need not produce evidence to show

10

this absence; instead, it may discharge its burden by pointing out to me an absence of evidence to support the nonmovant's case. *Id.* at 325.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and submit admissible evidence supporting its position. *Celotex, supra,* 477 U.S. at 324.

I accept the nonmovant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But the nonmovant must show that there is sufficient evidence that would allow a jury to find in her favor. *Anderson, supra*, 477 U.S. at 249.

"If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249–50 (internal citations omitted). "The mere existence of a scintilla of evidence" in plaintiff's favor is insufficient. *Id.* at 252. My task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020); *accord Anderson, supra*, 477 U.S. at 248 ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## Discussion

Plaintiff's Complaint contains three causes of action, which I divide into two categories. First, the fraud claims consist of one count of common law fraud (Count II) and one count of

11

fraud in the inducement (Count III) against both Ms. And Mr. Black. (Doc. 1, ¶¶ 24–44). Second, there is one count of breach of oral contract (Count I) against Ms. Black only.

### 1. The Fraud Claims

Plaintiff has failed to show a genuine issue of material fact in both of its fraud claims. Under Ohio law, the elements of traditional fraud and fraudulent inducement are the same. *Aero Fulfillment Servs. Corp. v. Oracle Corp.*, 186 F. Supp. 3d 764, 775 (S.D. Ohio 2016). To prove fraud, a plaintiff must show: "(1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance." *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) (quoting *Lepera v. Fuson*, 613 N.E.2d 1060, 1063 (Ohio 5th Dist. Ct. App. 1992).

Generally, fraud cannot be predicated upon promises to do something in the future. Such a promise about an indeterminate future, "from its nature[,] cannot be true or false at the time when it is made, and thus cannot generally be fairly viewed as a representation of fact." *Langford v. Sloan*, 833 N.E.2d 331, 335 (Ohio 2d Dist. Ct. App. 2005). However, if a person makes a promise that they have no *present* intention of keeping, then that fraudulent intention constitutes a misrepresentation of fact at the time of contract. *Id.*

Plaintiff has not identified any false representation of fact made by the Defendants that induced it to enter into the sales contract. Ms. Black promised in the contract, *inter alia*, to assist with the transfer of and changes to the Certificate. Plaintiff has submitted no evidence that Ms.

12

Black intended to break that promise at the time she made it. It was a promise to do something in the future and thus was not fairly a representation of fact that could be either true or false.

Plaintiff also argues that Defendants tried to "fraudulently induce Plaintiff[] to purchase" the two Cessna 310 aircraft, which were not part of the oral agreement, by pressuring Plaintiff. (Doc. 55, pgID 422). But business pressure is not itself a misrepresentation, and Plaintiff identifies no false statement. Further, Plaintiff never ended up purchasing the Cessna 310s and therefore could not have been actually induced to do so.

Plaintiff last argues that they sold the Cessna 414 because it had mechanical issues that made it unairworthy, "contrary to the representations that the Blacks made to Plaintiffs at the time of the purchase." (*Id.*, pgID 425–26). But Plaintiff does not provide any evidence—or allegations, for that matter—of representations about airworthiness. Even the LOI is silent on this point; it does not include any warranty by Ms. Black that the Cessna 414 was airworthy at the time of sale.

Plaintiff has not met its burden of production on the fraud claims. Therefore, I grant summary judgment in Defendants' favor on Counts II and III.

### 2. The Breach of Contract Claim

Plaintiff claims that Ms. Black breached the oral agreement when she failed to provide assistance with the transfer of and changes to the Certificate. To establish a breach of contract claim, a plaintiff must show: "[1] the existence of a contract, [2] the failure without legal excuse of the other party to perform when performance is due, and [3] damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018).

Regarding the existence of a contract, Plaintiff argues in their response brief that its agreement with Ms. Black was not a written contract but an oral one. (Doc. 55, pgID 420–21).

13

Plaintiff's brief does not identify record evidence that shows an oral agreement. It merely states, "as per the terms of the LOI, there was an agreement . . . ." (*Id.*, pgID 420). Plaintiff does not show evidence of who orally agreed, when they agreed, and to what they agreed. Only Plaintiff's allegations in its Complaint explain the oral agreement, but I do not consider bare allegations at the summary judgment stage. *See Bormuth v. Cnty. of Jackson*, 870 F.3d 494, 519 (6th Cir. 2017).

However, a reasonable jury could conclude that the bill of sale for the Cessna 414 shows that the parties agreed to the sale of the plane and other Island Seas assets as outlined in the LOI. (Doc. 55-2). Further, in Ms. Black's deposition—before the parties prematurely terminated it due to a witness issue—she testified that she received the $185,000 consideration, which was consistent with the terms in the LOI. (Doc. 42, at 30:10–31:14).

Defendants do not raise an issue regarding damages. Defendants instead argue that Mr. Black is not a party to the oral agreement and therefore could not breach it. (Doc. 49, pgID 307–10). Defendants also argue that Ms. Black fully performed her obligations under the agreement. (*Id.*, pgID 310–14).

### a. Charles Black's Liability under the Agreement

Plaintiff concedes there is no oral contract with Mr. Black. (Doc. 55, pgID 421). Yet Plaintiff argues that a material issue of fact exists because "it was the intention of the parties that Mr. Black would continue in his role as [pilot] during the transition period." (*Id.*, pgID 422). While that fact may be relevant to the contract claim against Ms. Black, it does not make Mr. Black individually liable for breach of a contract to which he was not a party.

A party cannot be bound by, and therefore cannot breach, a contract to which they never agreed. *See Smith-Knabb v. Vesper*, 206 N.E.3d 1265, 1271 (Ohio 12th Dist. Ct. App. 2023)

14

(explaining that enforceable contracts require the assent of the parties to be bound). Plaintiff admits Mr. Black did not agree to the contract, and he is therefore not liable for breach. As no claims remain against Mr. Black as a named Defendant, I dismiss him from this lawsuit.

### b. Relevance of Charles Black's Conduct

I reach no decision, however, regarding the relevance of Mr. Black's conduct. "Under the doctrine of respondeat superior, a principal is vicariously liable for acts of its agent committed within the scope of the agency." *Ryan v. Ambrosio*, 2008-Ohio-6646, ¶ 29 (8th Dist. Ct. App.).

The gravamen of Plaintiff's Complaint, and the ultimate source of its injury, was Mr. Black's surrender of the Certificate to the FAA, hamstringing Plaintiff's operations. If Mr. Black was acting as an agent of Ms. Black when he did so, then Ms. Black may be liable for the acts of her agent. *See White v. Allstate Ins. Co.*, 2008-Ohio-140, ¶ 52 (discussing respondeat superior liability for an agent's breach of its principal's duty of good faith); *cf.* Restatement (Second) of Agency § 17 (Am Law. Inst. 1958) ("A person . . . subject to a duty[] to perform an act or accomplish a result can properly appoint an agent to perform the act or accomplish the result . . . .").

Mr. Black denies that he was ever employed by Island Seas or his spouse. (Doc. 41, at 68:2–3). According to him, he flew planes for Island Seas and was its director of operations, but Island Seas never paid him; he provided all of these services to a for-profit business completely gratis, "[j]ust to stay current" as an aviator. (*Id.* at 70:4–6).

However, according to the FAA operations specifications, "[t]he Director of Operations and Chief Pilot listed in th[e] operations specification [*i.e.*, Mr. Black] must be direct employees of the certificate holder [*i.e.*, Island Seas]." (Doc. 55-3, pgID 441).

15

Additionally, Mr. Black did not carry his own liability insurance for the services he provided to Island Seas. He assumes that Island Seas covered him under its own insurance policy. (Doc. 41, at 70:11–71:5). A reasonable juror could conclude that Island Seas insured Mr. Black because he was its employee.

Finally, viewing the evidence in the light most favorable to the Plaintiff, the Defendants appeared to be acting together in their interactions with the Pablo Air and the FAA, beginning with the September 10, 2020 meeting with the FAA inspector. Pablo Air's managers along with *both* Ms. and Mr. Black attended this meeting.

The emails are also replete with the Defendants referring to themselves jointly or acting jointly with respect to the FAA and Pablo Air. On September 25, 2020, Mr. Black wrote the FAA inspector to ask if Ms. Black could make changes to the Certificate by removing the Cessna 310 planes from it. (Doc. 55-5, pgID 447).

In her September 27, 2020 email to Pablo Air, Ms. Black wrote in part: "You talk a bunch of shit to *people* [plural] that have operational control of your company"; "*We* did our part to transition over"; "Good grief *we* have bent over backwards trying to accommodate you"; "Once again for the people in the back . . . BOTH 310's are still on the ticket and *we* have operational control. Make a move or *we* will." (*Id.*, pgID 443) (emphasis added).

In an email the next day, the Defendants wrote together: "*We* are removing the [Cessna] 310's and retain operational control until *we* have confirmation they have been removed. You terminated the sale on the 23rd and did not tell *us*"; "*We* have fulfilled *our obligations* to you. Please do not feel free to contact either of *us* anymore"; "Respectfully, Kris *and* Chuck[.]" (Doc. 55-8) (emphasis added).

16

I cannot determine, as a matter of law, the muddled personal-business relationship between the Defendants. Based on these facts, a reasonable jury could conclude that Mr. Black was acting on behalf of Ms. Black or that he acted at her direction—making his conduct relevant to the claim against Ms. Black.

### c. Kristine Black's Liability under the Agreement

Whether Ms. Black performed in good faith her promises to help transfer the Certificate to Pablo Air is also a question for the jury that I cannot resolve on summary judgment. As our neighbor circuit aptly observed:

> The office of the doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of [a] rule. "Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.

*Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991) (internal quotation marks omitted).

Under Ohio law, all contracts carry with them an implied duty of good faith in their performance.[4] Good faith performance "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" while bad faith, conversely,

---

[4] The contract, as evidenced by the LOI, also contains an agreement that "The Seller will act in good faith to complete all activities . . . including . . . .receipt of all necessary government approvals to affect transfer of all Business assets to the Purchaser." (Doc. 49-3, pgID 329). Thus, not only was Ms. Black bound by the *implied* duty of good faith, she also *expressly* agreed to act in good faith to complete the transfer of the Certificate to Pablo Air personnel. However, I have found no Ohio case that draws a distinction between the two. *Cf. In re Midway Airlines, Inc.*, 180 B.R. 851, 938 (Bankr. N.D. Ill. 1995) ("The Court has been unable to find any [Illinois] case that made an analytical distinction between the implied and express duties of good faith."). Other states interpret express and implied duties of good faith in the same manner, and it makes sense to do so here where the agreement does not provide its own definition. *See, e.g., Colby v. InterDent Serv. Corp.*, 2018 WL 5284202, at *3 (D. Or. Oct. 24, 2018) (applying Oregon law).

"may consist of inaction, or may be the . . . interference with or failure to cooperate in the other party's performance." *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio 1st Dist. Ct. App. 2005) (quoting Restatement (Second) of Contracts § 205 cmts. a, d (Am. Law. Inst. 1981)); *see also Matus v. Lorain Cnty. Gen. Health Dist.*, 707 F. App'x 304, 312 (6th Cir. 2017).

Ms. Black raises three arguments in support of summary judgment on Plaintiff's breach of contract claim. *First*, Ms. Black argues that she fully performed her contractual obligations because she introduced Pablo Air's managers to the FAA inspector. (Doc. 55, pgID 295; Doc. 56, pgID 460). And for about one month, Ms. Black appeared to cooperate and assist Pablo Air with transferring the Certificate. But on September 28, 2020, Ms. Black simply stopped cooperating. She, along with Mr. Black, wrote to Pablo Air: "Don't bother calling. . . . Good luck finding someone to move the [Cessna] 414. . . . Please do not feel free to contact either of us anymore." (Doc. 55-8).

Viewing the evidence in the light most favorable to the Plaintiff, Pablo Air was left hanging, and it could no longer rely on Ms. Black to assist with transferring the Certificate. Pablo Air said as much in its email to the FAA, advising it that the Defendants were no longer communicating with them and were therefore terminated as employees (Doc. 49-11).

It may be that Ms. Black fully discharged her obligations to assist with the Certificate after only one month. But a reasonable juror could conversely conclude that she failed to perform her contractual duties in good faith through her inaction and her failure to cooperate with Pablo Air and the FAA after September 28, 2020. *See Littlejohn, supra*, 839 N.E.2d at 54.

Also, Plaintiff has presented evidence that Ms. Black's breach did not stop at inaction and inattentiveness. A reasonable jury could determine that Mr. Black was acting as Ms. Black's

18

agent when he surrendered the Certificate to the FAA.[5] Whether he did so because he was concerned about his personal liability under the Certificate or because he and Ms. Black wanted to spite the Plaintiff after their relationship soured is a fact question that I cannot resolve on summary judgment. (*See* Doc. 49, pgID 323).[6]

*Second*, Ms. Black argues that, under FAA rules, "[a]ll responsibilities for the Certificate . . . fell on the Plaintiff" after Plaintiff became the new owner and holder of the Certificate. (Doc. 49, pgID 311–14). But this does not release Ms. Black from her own promise to assist with transferring and changing the personnel on the Certificate. Even if Ms. Black no longer had a *regulatory* duty vis-à-vis the Certificate according to the FAA, she took on a *contractual* duty to assist.

*Third*, Ms. Black argues that the Plaintiff's own actions "frustrated and made it impossible for both of the Defendants to assist and cooperate with . . . respect to the Certificate." (*Id.*, pgID 316–18). This is again a factual disagreement for a jury to resolve. I cannot determine on this record, as a matter of law, whether and to what extent Plaintiff is responsible for its own injury.

Viewing the evidence in the light most favorable to the Plaintiff, genuine issues of material fact remain on the breach of contract claim against Ms. Black. Those issues ultimately must be determined by a jury.

---

[5] On this point, Defendants argue repeatedly that Mr. Black had no authority to surrender the Certificate because he was not the Certificate holder. (*E.g.*, Doc. 56, pgID 462). Rather than absolving him, this makes matters worse. Not only did he still surrender the Certificate, as a matter of demonstrable fact, but he also did not have a legal right to do what he did.

[6] Defendants argue that the FAA gave them no choice, that the inspector's "directive was unequivocal—the certificate had to be surrendered." (Doc. 49, pgID 303). Far from being unequivocal, the inspector asked Mr. Black whether the Certificate was "being voluntarily surrendered by [him] at this time." (Doc. 49-14). An action can be either voluntary or compelled; it cannot be both.

**Conclusion**

It is, therefore,

ORDERED THAT:

1. Defendants Motion for Summary Judgment (Doc. 49) be, and the same hereby is, granted in part and denied in part.

2. Counts II and III of Plaintiff's Complaint (Doc. 1) be, and the same hereby are, dismissed with prejudice.

3. Defendant Charles Black be, and the same hereby is, dismissed as a party defendant.

4. Count I of Plaintiff's Complaint (Doc. 1) remains pending against Defendant Kristine K. Black only.

5. The Clerk shall forthwith schedule a status/scheduling conference.

SO ORDERED.

*/s/ James G. Carr*
Sr. U.S. District Judge